May it please the court. Your Honor, this is a whistleblower protection Enhancement Act retaliation case, as the court is aware. And going to the issue of the per diem and consequential damages, I would point out that in the TDY status, the level of- $363,000 seems like an awfully large number. It does, Your Honor. Quite frankly, it does. Doesn't he have to show that he actually suffered those damages? Your Honor, if he was being paid the per diem, he doesn't have to provide receipts every time. And I think that goes to the crux of the situation. Mr. Foucault put Mr. Hickey, the retaliator, that AJ found was the retaliator, put Mr. Foucault or put Mr. Hickey in a situation that was intended to cause distress. This was a position known as the punishment group within the agency. He was put into a situation called Highway Therapy, where he was being sent to commute into Boston every day from his regular workstation, then sent around as a 21-year employee, 23-year employee, being required to issue summonses and subpoenas on people in Boston, and then commuting home. The travel into and out of Boston, and I would just submit the traffic is not the same as traveling in and out of the Rhode Island location where he was in, was eating 13, 14 hours a day, such that Mr. Hickey, on his GS salary, on his GS-13 salary, wasn't able to go to a hotel every night and pay for this for 19 months. And wasn't able, it would be still going on if the AJ hadn't stopped it. And the AJ stopped it because Mr. Foucault testified below that he was going to- Was he reassigned to this? He was put on a TDY status, a temporary duty status. And it put Mr. Hickey in essentially a regulatory no-man's land. I've been trying to think of the correct word for what happens when you've got a hegemony or a rubric of government or of agency regulations that are not necessarily perfectly aligned. But what happens here is Mr. Hickey was forced to work outside of his regular commuting area, 62 miles away. He wasn't within the immediate commuting area, such that he would be entitled to the local per diem benefits. But Mr. Foucault, the retaliator, made the discretionary decision that because he wasn't outside of the 50 miles for 12 hours a day, because it encompassed traveling, that he wasn't going to exercise the discretion to allow the per diem, even though Mr. Foucault made that same decision for someone who went to Springfield, which is 99 miles away, and allowed that person. The dilemma and the conundrum that Mr. Foucault was creating here for the person that the court determined this was purposeful retaliation was putting him in a situation where he was not getting reimbursed for the travel because it was in a government vehicle, but he was being put in a situation where Mr. Foucault knew that he was working 15, 16 hours a day and travel, et cetera, and serving summonses. And he was being forced to have minimal interaction with his family, have minimal time off. Doesn't this come down to whether or not the administrative judge understood the agency travel handbook correctly? It does, but I think that the- And if the statement about being away from a local commuting area means 50 miles, then what that would mean is, as a technical matter, the person, Mr. Hickey, had to travel 12 or 13 miles outside of the local commuting area every day. And then it would stand to reason that the board, therefore, or the AJ made a reasonable finding that if he was only traveling 12 or 13 miles outside the commuting area to and from Boston every day, then it would come in under 12 hours in terms of you count that commuting time of 12, 13 miles every day plus the nine, 10 hours of work that would come in under 12 hours. Your Honor, that is correct, Judge Chen. I would submit, though, that the issue is not clear if whether you have to be outside of the commuting area for 12 hours and say you spend three hours traveling and you work 12 hours and then you spend three hours back, that's compensable versus if you spend two hours traveling 15 hours there, forgive my numbers, it's whether you have to be outside of the 50 miles for 12 hours and then come back or whether you can put someone in the situation where you say come back after 11 hours and then you preclude them from getting the TDY bene, or the per diem benefits. I think- Was there any evidence, Rick, I understand the numbers, you know, 12 miles versus 50 miles, but was there any evidence about the amount of time it takes to go those 12 miles in Boston as opposed to the rest of the- No, we didn't break it out that way. I will tell you the last 12 miles of any commute into a major metropolitan center, as anyone who's commuted into DC knows, is the most punishing part. And that is the purpose of this punishment group. I would submit that the time and travel status in the agency- But it's under any reasonable measure, it's not gonna be more than 12 hours for those last 12 miles. Certainly not, no, sir. But the agency's premium pay guide is instructive here, and it says that the time actually traveling between points is to be considered in terms of what their travel time is. And that's the appendix of 399, I mean of 319, and that says that time and travel status begins when you leave your official duty station and you get to the point of destination. In this case, that means that the 60 miles between the Providence station and the Boston station would be time and travel. Does the premium pay guide have anything to do with temporary duty stations? It's part of the premium pay regulations. I don't think that these necessarily- My understanding is that the premium pay guide is directed to something else, whereas the agency travel guide encompasses many things, including what to do about temporary duty stations. It does, Your Honor, and I would point out that one of the ironies of this, and I think it's quite frankly a sloppy plan that DHS has, because the TDY per diem plan refers, it refers, and I'll just simply point to the appendix, the temporary duty in the ICE travel handbook provides information or direction to go to- Where in the appendix? Appendix 260, where it sets forth the 50 mile location. Right underneath the paragraph at A1A, it says, for further information on local travel, see chapter four. And chapter four is found at appendix 277, which says that if you're within the 50 miles and you're working more than 12 hours a day, and you incur the meals and incidental expenses and you remain in travel status for more than 12 hours and you're within the 50 hours, you're entitled to per diem. And what the agency has argued here is he wasn't local because they were pushing him outside of the 50 miles so he doesn't get the local pay, which is clearly contemplating this sort of situation. So they're saying Foucault put him in between these two positions. And that, I think, if it is not compensatory as income, is intended to put Mr. Hickey in a situation where he would incur compensatory damages. This is evidence of retaliation. This was done to make his life hard. The AJ below found that fact. And the AJ made the finding- We get that he was retaliated against, but you still have to have a theory of consequential damages under 1214 and 1221 that entitles him to damages. And it seems like you're relying on the TDY statutes and regulations. I am for the per diem, but I would submit that even if this court, as a matter of law, didn't find the time and travel status in the premium pay guide instructive as to whether when you get out of the local area, instructive or informative as to when the time to start considering the 12 hours that clock should run, if that was the case and Mr. Foucault was doing this to put him in the no-man's land between the per diems, then that would go to compensatory damages because Mr. Foucault was doing this to punish Mr. Hickey. And his testimony below was, I was doing it and I was gonna keep him in that position until he learned his lesson. Do you wanna address the attorney's fee issue? Yes, Your Honor. The attorney's fee issue, I believe, is the simplest issue, quite frankly, in Swanson v. DLA, the board below, or the board said that in order to prove the fee rate, we can either submit our retainer agreement, which we did, and we put forward proof of our customary billing rates, which we did, we put forward our proof of billing rates. Now, I mean, the board is allowed, if it gives a good reason, to reduce fees from fee arrangements, right? Yes, it is. You're not entitled to get exactly what you billed. It's the ceiling, generally, but they're allowed to reduce it if they give a good reason. Yes, sir. And I assume your argument is that this is what you charged in a different case, in a different situation, is in a good enough reason. No, sir, not only, yes, I agree with that, but. But isn't it further that the other case was constrained by local rules? That's what I was getting to. In Maryland, as this court, I believe, should be aware, has local rules that cap rates, and so we don't bill at those rates. We are artificially constrained when we are there, and as we've submitted in our positions, and as the court in those decisions said, we understand you bill at different rates. What's the difference between what you billed at and the rate, the Maryland rate? It's about $70 an hour. Off the top of my head. And we bill. So if the board had wanted to cut it from your billed rate to that rate, they would have had to come up with some other explanation in your view of why your rate was too much for this type of litigation, blah, blah, blah, or otherwise unreasonable. My firm, because we're in the district, and because we have a national practice, we bill at Laffey rates, and Laffey rates, as the court is aware, go up each year. We typically don't raise the rates on clients each year commensurate with it, but when the retainer rates go out, we bill at Laffey rates, and then consistent with the- We don't have the fee agreement here in the record, do we, between you and your client? I don't know if it's in the appendix, but it was submitted to the court below, or to the AJ, who read it and said, I see this is what you charged him, and Mr. Hickey did, in fact, pay those hours. Why isn't it just the best, singular, most reasonable thing to do, is that the attorney fee should be, should follow the fee agreement that Mr. Hickey followed? That's what the MSPB says. It puts forward what the rates are, and it says the best evidence is the fee agreement, and we are arguing that if it did not, if the AJ did not give us Laffey rates, then he should have at least given us the fee agreement, because under Missouri versus Jenkins, you're entitled to Supreme Court precedent, that you're entitled to present value rates, so when you have a case that you signed up 10 years ago, you're not getting paid at the 10 years ago rates, but even if the court didn't give us the Missouri versus Jenkins rates, a Supreme Court decision, the board precedent is that we're entitled to, or dictates that it's the retainer rates that should govern, and just going out and finding a venue that pays us less, that's discounting the fact that there are venues that pay us more, if we were going to Manhattan, we're going to get more, to select a venue that's under. What was the difference between the Laffey rates and the retainer rates? The Laffey rate, at the time this decision was issued, I think it's about $50 or $60 per hour, but the rates when the case was signed up, these were the Laffey rates. So your fee agreement didn't say, Mr. Hickey, you're going to pay me at the Laffey rate, whatever the Laffey rate may be in the given year that I'm still working for you. No, Your Honor. I just said $490 an hour. We sign them up and cite the Laffey rates, but because our clients are individuals, they typically are struggling to pay our rates, and so upping them when the Laffey rates go up, I think we've made a business decision that that's probably more than the individuals can likely handle. I would reserve my time at this time. Thank you. Good morning. May it please the court. Can you address the attorney fees issue first? Certainly, Your Honor. It seems really troubling that the board used an unrelated fee rate from a litigation where it was capped in an area that wasn't this case. Your Honor, so I want to make several points with respect to that question. The first has to do with what the administrative judge had in front of him and so why he went looking. The second has to do with the actual, the Maryland rates. First, the administrative judge pointed out that, as I believe Your Honor did, the MSPB's precedent says that the fee agreement rate is the max possible reasonable rate. Anything above that is presumptively unreasonable. Sure, but if they're gonna go below that, they have to have a rational argument as to why to go below that, which would be something along the lines of, well, that's too high for this area or the like, but that's not what he looked at. If this case had been tried in Maryland, maybe that would have been reasonable, but this was a D.C. firm. Was this out of the Boston regional office? It was, Your Honor. But there was no suggestion. Did the government argue that the Boston rates are lower than the D.C. rates and they should apply the Boston rates? No, Your Honor, and I don't believe there's anything in the record suggesting what the Boston rates typically are. Did the government argue that Maryland rates should apply? No, Your Honor. It seems pretty arbitrary to go pluck a number from a different forum that this case wasn't in and his lawyers weren't in. Your Honor, the administrative judge indicated that all he had in front of him, barring the justifications for these higher LAFI rates, was the fee agreement, and he was under an obligation to determine whether or not that rate itself was reasonable. So he went- Which rate, the LAFI rate? No, Your Honor, the fee agreement rate. Right. And so he went to, evidently- And the fee rate was lower than the LAFI rate, which is customarily applied in D.C., so why wasn't it reasonable? Well, as Your Honor indicated, the, I'm sorry, as- Why did he find the fee rate unreasonable? Your Honor, there isn't, there is no presumption that the fee agreement is a reasonable rate. It is incumbent upon the administrative judge to determine what the reasonable rate is, given the evidence in front of him, a piece of which is the fee agreement. Another piece of that is what the firm charges for cases in similar areas of law in similar communities. But Maryland's not a similar community, is it? Well, Your Honor, so looking at the- I mean, this MSPB judge, I don't know how long he or she's been on the bench, but most of them are familiar with the LAFI matrix, and most of them are familiar with who's a D.C. firm or not, and that that's traditionally the rate given to D.C. firms. First, Your Honor, I would point to the declaration provided by the Employment Law Group in support of their request. And it indicated, it never specifically said, we typically practice in D.C. It said, we typically charge the LAFI fees, and we customarily practice,  the D.C., Maryland, Virginia, I believe Tennessee, Florida, and California. So Maryland is one of the areas in which this firm evidently customarily practices. With respect to the Maryland rates- I mean, if this case were in Maryland, that would be perfectly reasonable. I mean, what if they said in their declaration that they practice in Oklahoma, and the A.J. decided to pluck out much lower Oklahoma rates, even though the case was tried in Boston and they're a D.C. firm? Wouldn't that be, per se, arbitrary? Well, Your Honor, the- Without anything more. I mean, it's just really, there's no rationale for why Maryland fees are relevant to this case at all. Your Honor, in this particular scheme, the question is not the rates in which the proceeding takes place. It's the rates in which the attorney customarily, the community in which the attorney customarily practices. And the evidence provided- So for a national firm. So for a national firm- You can shop? The judge can shop the communities? Your Honor, I don't know that that would be the right way to put it, but the burden is upon the petitioner to demonstrate that the fee requested is reasonable. And in this case, the evidence that the petitioner presented had to do with fees that were significantly higher than the fee agreement rate, which the administrative judge found- Well, if that was the petitioner's fault, then he should have cut it to the fee rate. Or at least come up with a good reason why the fee rate itself wasn't reasonable. He didn't find that the fee rate was unreasonable, did he? Not to say, Your Honor, no. He just found that he was kind of not a word-laffy matrix. Your Honor, what the administrative judge was evidently attempting to do was to find cases in which this firm had represented similar clients and charged similar rates. Now, I do wanna get back to this specific District of Maryland local rules. First of all, I would point out that this is the Southern Division of the District of Maryland, which sits in Greenbelt. Second, the local rules that describe the attorney's fees provisions, with respect to the rate language that sets these numbers, it is permissive. It's a guidance, and it's very clear on that. There's a very long footnote indicating that these are just suggested rates. They're based on fairly old metrics. If the attorneys believe that they're not appropriate- And did the judge discuss that in any fashion? Not that I'm, the administrative judge here, no, Your Honor. But the local rules also indicate that the purpose of these rules is to normalize what the court understands as the reasonable market rates for the area, and that the judges are, first and foremost, bound by precedent law regulation concerning reasonable attorney's fees. There's a peculiarity, an additional peculiarity, in that there was a recent request for supplemental attorney's fees, where this AJ used the fee agreement rate for that. So doesn't that sound a little arbitrary and capricious, that during the first set of attorney fees, you went with the Maryland local rule rate, and then for the supplemental fees to go after those first set of fees? Now the AJ is popping up with the fee agreement rate? Your Honor, I don't think it is an arbitrary decision. The primary distinction in the sense, in between those two cases, is time frame. And what the administrative judge noted with respect to the first case was that the Maryland court was, with respect to fees from, I believe, 2014 through 2016, there was a- What was the year of the first attorney fees ruling by this AJ? I believe it was 2015, Your Honor. And then the second one was the fall of 2017. And that later case did involve rates at a later time frame, which would have been more applicable to the fee dispute rates in this case. I also, in this instance, again, in the second- So you get the fee agreement rate when the fee agreement was entered into in 2014. You get that 2014 agreed upon rate if it's 2017. But if it's 2015, you don't get that 2014 agreed upon rate. Your Honor, that wasn't the analysis of, I think, by the judge. Looking at the result. Your Honor, and I think it goes to show that there are, there is certainly a reasonable range. And this range is not that wide. We're talking somewhere between 400, 490. And the, in particular, the Maryland case also takes- It's probably pretty large to Mr. Hickman. If it's $70 an hour, that's a lot of money for somebody at his DS level. And I acknowledge that, Your Honor. But at the same time, it is a range that would reasonably be expected to be found for attorneys in- If the AJ had said, we find their charged rates too high because this is not what lawyers in DC usually charge for Boston litigations and had a good reason, then that might be affordable. But when the AJ arbitrarily plucks out a number from a Maryland litigation for what is clearly a DC firm for a Boston litigation, I don't see how that's anything but arbitrary. I understand the concern, Your Honor. First, I would point out that, again, this is a nationwide firm, not specifically practicing in DC. Because they're a nationwide firm, but they're based in DC, and we all know they're based in DC. It's on their address. You can't just go to whatever jurisdiction you wanted. He could have went to, like I said, Oklahoma and come up with $200 an hour, and that might have been Oklahoma rates. And if they have Oklahoma cases, maybe that's what they charge. But that's the definition of arbitrary. You have to explain some connection between the jurisdiction you're using the fees for and this litigation. And there's no connection between Maryland and Boston or Greenbelt and DC. Well, again, Your Honor, there isn't necessarily a nexus between the litigation and the fees charged. Because under this particular statute, it has to do with the customary practice area of the attorney. And in this case, as the administrative judge very clearly indicated- The customary practice area of this firm is clearly Washington, DC. Because that's where they're located. Well, Your Honor, I would disagree, given that the... Did the government put forth any evidence that this firm, even though they're located in DC, generally practices in Maryland or generally practices in Oklahoma or generally practices elsewhere besides Washington, DC? No, Your Honor. Frankly, in front of the MSPB, the government's dispute was with the fact that the fee application was for a rate that was significantly higher than the... So there really wasn't a lot of focus on that. And AJ would have been perfectly reasonable in saying, look, I'm not giving you Lafee Matrix fees because you only billed him at a lower rate. You get the lower rate. Potentially, Your Honor, but AJ is required to consider more than just the fee application. And he specifically said, I have no evidence before me of the reasonableness of this fee application rate. Well, yes, he does. He has the Lafee rates. Well, but the Lafee rates, Your Honor, as he found, are significantly higher. The fees- Exactly. That's what makes it reasonable. They're charging less than what they would be entitled to as a deceiver. Not necessarily, Your Honor. I mean- Let me change to the focus a little bit. Certainly, Your Honor. To the compensatory damages question. Yes, Your Honor. Let me pose a hypothetical. Supposing instead of Mr. Hickey, the same thing had been done to Mr. Green. And Mr. Green doesn't have the moral or psychological strength to withstand that continued harassment and kills himself. Compensatory damages available to the estate? Probably, Your Honor. Frankly, I haven't seen a case where an estate is suing, but I would imagine that would certainly fall under a permanent harm. Not to make light of that particular hypothetical. No, because it was clearly designed to harass this individual. There's no question about that. Yes, Your Honor. And I think that proves the point of the administrative judge's distinction in this case, where the harms, for two reasons. The harms that Mr. Hickey presented were these global harms related to a whole bunch of different. His family relationships. All the things that pretty clearly a supervisor intended to do to him. Well, Your Honor, what I was going to say is they were related to a lot of actions that were not found to be retaliatory actions by the MSPB. Like the hostile work environment allegation? The hostile work environment allegation, yes, Your Honor. There's also the sort of side issue of Mr. Hickey's concern for his safety with respect to some things that had happened with the confidential source. And that seemed to be, based on his declaration, the source of his family, a large source of his family problems. Particularly in that he indicated that because of this concern about his safety, his family lived several states apart. And that very specifically caused the administrative judge to limit the apparent harm caused by the actual unlawful actions because they couldn't clearly be tied to the harm that Mr. Hickey was alleging. The administrative judge did acknowledge that there certainly was some reputational harm, some emotional and family relationship harm. That's a pretty low number. It was, and Your Honor, the administrative judge supported that number with similar cases in which the harm, frankly, was not long-term, not permanent, and would, was tied to the actual unlawful actions taken by the agency. So that number is supported by the MSPB's precedent. In my last few seconds, I will very briefly turn to the consequential damages here. The discussion of whether or not Mr. Hickey was or was not entitled to per diem was, frankly, a red herring. This is about what his out-of-pocket expenses were, what he demonstrated that his out-of-pocket expenses were. And he provided no evidence that he incurred hotel fees, mileage, meals, et cetera. With that, I would ask that the court affirm the decision of the MSPB. Thank you, counsel. Thank you. Your Honor, I would simply point out that 19 months of sleeping on floors or sleeping in your car is not the same as other discrete claims that Mr. Hickey brought, such as saying they did this particular act of discrimination or retaliation against me on this particular day. These things are not fungible, that one can be traded for another like bricks of Lego. 19 months of punishment and separation from your family is devastating. Likewise, telling someone like Mr. Hickey of finite means that you don't get any compensation because you slept in your car, because you didn't stay in a hotel, there's no blood, no foul, is preposterous. Well, you're arguing this as a consequential damages theory or maybe as a commenced damages, but consequential damages seems like damage is actually incurred. If you think that he didn't properly get TDY allowances and per diem allowances based upon the applicable statutes and regulations, even though he didn't suffer actual damages, wouldn't his claim there be in the court of federal claims for breach of the money-managing statutes and regulations? It would, if I might, Your Honor, I'm about to run out of time. Yeah, you can finish your response. It would, Your Honor, if it was not in the rubric of damages available under the WPA and the WPA, just because the court of claims allows for contractual damages for the wage, or for, I'm trying to remember the name of the act, it's the Back Pay Act, does not mean that it's mutually exclusive that these damages wouldn't be recoverable under Title VII. Likewise, you can recover for wages. If I might just finish and wrap up. Yes, sir. The original fee decision was in 2017, the November 2017, and the second fee decision was about six months later after the agency submitted its brief, so there wasn't, it wasn't in 2014, there wasn't that time difference as represented by counsel. I would finally say that Mr., or the AJA below, rejected my declaration and my firm's declaration of what we bill, without even just explaining why, when we said we'd met the standard, which is where we met the MSPB standard. He rejected Ms. Alden's affidavit as to what the reasonable rates were. Is that in the record? Yes, yes. And he also basically rejected Mr. Hickey's and his wife's declarations as to what the undisputed damages were. He didn't, the AJA didn't take testimony, the agency didn't depose them, didn't take any discovery. The only evidence before the court was the evidence, and we cited it verbatim. I would vehemently disagree with the agency that where it said he didn't draw a line, that's why I cited it at length here, because he said sleeping in my car and being separated from my family caused great emotional distress. The last. Wrap it up, wrap it up. I would submit that's it. Thank you, counsel.